U.S. DISTRICT COURT
SO. DIST. AL.
MOBILE, AL 36602

2000 NOV -2 P 4: 21

FILED
CLERK'S OFFICE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **J. H. WRIGHT & ASSOCIATES, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION 00-0906-RV-L** |
| | ) | |
| **ERIC R. ENGERSON, ROY ARSTON GRANT, PRECISION SYSTEMS, L.L.C., and PELICAN, L.L.C.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# REPORT AND RECOMMENDATION

This matter is before the court on Plaintiff's Motion for Injunctive Relief. (Doc. 1). On October 10, 2000, Plaintiff filed a Verified Complaint for Temporary Restraining Order, Writ of Seizure, Injunctive Relief, and Damages claiming that defendants, Eric R. Engerson ("Engerson"), Roy Arston Grant ("Grant"), and Precision Systems, L.L.C., now known at EGM, L.L.C. ("Precision Systems" or "EGM")[1], violated the Lanham Act, 15 U.S.C. §1125(a), misappropriated trade secrets in violation of the Alabama Trade Secrets Act, Ala. Code §8-27-1 *et seq*, breached confidential relationships, converted plaintiff's property, and engaged in other wrongdoing. Plaintiff also filed an Application for Temporary Restraining Order (Doc. 2), a

---

[1] Plaintiff also sued Pelican, L.L.C. ("Pelican"), alleging that Pelican acted as the agent of the other defendants in placing a sham order (referred to in the Complaint as "the Pelican Order") for certain Roper Roc pumps and other equipment. The Pelican Order items were returned to plaintiff on October 16, 2000. (Pl. Exs. 37, 38). Plaintiff filed a Stipulation of Dismissal Without Prejudice of Pelican, L.L.C. on October 18, 2000. (Doc. 21).

Motion for Immediate Issuance of Writ of Seizure, which has been amended (Docs. 4, 19 and 25), a Motion for Preliminary Injunction (Doc. 6), and a Motion for Leave to Take Immediate Discovery and a Shortened Response to Rule 34 Request for Production of Documents and Tangible Items (Doc. 7).

This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B). The undersigned entered an Order recommending that the application for temporary restraining order without notice to the Defendants be denied. (Doc. 11) The undersigned further set plaintiff's Application for Temporary Restraining Order, Motion for Preliminary Injunction, Motion for Writ of Seizure, and Motion to Expedite Discovery for a hearing on October 19, 2000. (Doc. 18). The hearing commenced on October 19, 2000, and lasted approximately two and a half days.

The plaintiff and defendants have filed a "Joint Stipulation and Agreement and Consent Order", in which defendants have agreed and stipulated to certain items that obviate the need for injunctive relief with respect to the Lanham Act claims. Defendants have agreed and stipulated "that they shall not incorporate or organize a business entity under the name 'Precise Systems, Inc.' or any closely similar name." (Doc. 32). Defendants have also agreed and stipulated "that they shall not use or conduct any business under the names of 'Precise Systems' or 'Precision Systems' or any name including the words 'Precise' or 'Precision' or 'Systems' or any similar name likely to be confused with these names or words". Defendants have finally agreed and stipulated that "they shall not confuse or attempt to confuse any customer, vendor, or any person or entity that these defendants are still associated with J. H. Wright or purchased, acquired or continued J. H. Wright's 'Precise Systems' business in any form or fashion."

The plaintiff also filed a document in response to the Court's Order identifying what matters remained for the Court's consideration. (Doc. 20). In response to this Order, J.H. Wright narrowed their request to the following three items:

a) enjoin defendants from fulfilling unlawfully diverted purchase orders on the ground that defendants would necessarily use or disclose trade secrets of J.H. Wright in fulfilling those purchase orders;

b) enjoin defendants from performing work related to several quotes to customers that were made by either Engerson or Grant while they were employed by J.H. Wright on the ground that defendants would necessarily use or disclose trade secrets of J.H. Wright in performing this work;

c) issue a writ of seizure for certain property owned by plaintiff that is illegally in the possession defendants.

This report and recommendation addresses only the issue of whether plaintiff is entitled to the specific relief requested above.

## I. <u>Background</u>

The plaintiff, J. H. Wright, Inc., distributes and sells pumps, mixers, screening and filtration equipment, and other equipment and services, to municipalities and companies servicing the chemical and pulp and paper industries. In the early 1990s J. H. Wright began developing a new business line involving designing, fabricating, selling, and maintaining complete delivery systems to accurately manage solids and fluids for its customers servicing the chemical and pulp and paper industries. This new business line was eventually marketed under the name Precise Systems, as a division of J.H. Wright.

In 1997, Mark Wright, President of J.H. Wright, had discussions with the Defendants, Engerson and Grant, regarding the expansion of Precise Systems. Specifically, Mark Wright

states that the discussions involved the employment of Engerson and Grant, the direction of the business and the "possibility" that the Defendants may one day have an ownership interest in Precise Systems. At the time Grant and Engerson were working in a related industry. Grant and Engerson claim that Mark Wright made a promise in these discussions that, if they would come to work for Precise Systems, they would later be made equal partners in the enterprise. Specifically, the Defendants allege that in return for their investment of "sweat" equity and contribution of certain equipment[2] to the operation of Precise Systems, they would each receive a one-third ownership in Precise Systems. It is agreed that these discussions resulted in both Grant and Engerson leaving their jobs and coming to work at Precise Systems.

The defendant Grant, who has a degree in chemical engineering and a degree in pulp and paper technology, came to work for Precise Systems in January 1998. There was no written employment agreement , non-compete contract or confidentiality agreement between Grant and J. H. Wright. Grant's job duties principally involved managing Precise Systems. Prior to working at J. H. Wright, Grant had worked for eleven years at Nalco Chemical Corporation, where he had experience in designing, manufacturing and maintaining chemical feed systems. Grant took a cut in pay and benefits to come to work at J. H. Wright.

The defendant Engerson, who has a degree in business management, came to work for Precise Systems in February 1999. His job was to market and sell Precise Systems products. There was no written employment agreement, non-compete contract or confidentiality agreement

---

[2]This equipment belonged to EGM, a company owned by the defendants. Even after the defendants began work at Precise Systems, EGM conducted business with J.H. Wright, selling J.H. Wright parts. J.H. Wright allowed the Defendants to conduct this business at the J.H. Wright facility.

between Engerson and J. H. Wright. Prior to working at J. H. Wright, Engerson had worked at Nalco where he had experience in the marketing and sale of chemicals to the paper industry.

The status of Engerson and Grant at Precise Systems forms the basis of the dispute before the court. Sometime in the summer of 2000, Grant and Engerson started to query Mark Wright regarding their understanding that they were entitled to a one-third ownership in Precise Systems. Mark Wright in return offered them various alternatives including a twenty-percent ownership each in return for a $100,000 investment each. The Defendants took issue with the offer and demanded that Mark Wright keep his original promise of one-third ownership. From this point the relationship started to deteriorate.

On October 2, 2000, Engerson and Grant submitted their resignations as employees of J. H. Wright. However, prior to resigning, Engerson and Grant had begun to form a business under the name of Precision Systems, L.L.C. In this vein, they applied for a line of credit and started soliciting business. Moreover, before their resignation, over the weekend of September 30 - October 1, 2000, the defendants cleaned out their offices at Precise Systems. They took with them their furniture, property of EGM which had been stored at J. H. Wright[3], six boxes of files, and some inventory which either the defendants contend belong to them or which has been returned to the plaintiff. The items in the boxes and the missing inventory form the basis of plaintiff's request for a Writ of Seizure

[3]Engerson testified that they left approximately $20,000 worth of equipment that belonged to EGM at J.H. Wright. This equipment was used in the repair division and Engerson claims that they did not want to close the repair division down. This claim was not disputed.

## II. WRIT OF SEIZURE

The plaintiff's motion for a writ of seizure requests that the Court issue a writ seizing the following items: 1) one Moyno pump; 2) two Roper pumps; 3) one polymer dilution unit; 4) four stainless steel mixing blocks; 5) one test header; 6) two Gould pumps; 7) six boxes of materials; 8) all other documents and tangible items marked or identified by the names Precise Systems or J. H. Wright and Associates.

Fed. R. Civ. P. 64 states that remedies for prejudgment seizure are available as provided for under state law. Under Ala. Code §6-6-250 (1975), a writ of seizure is available for the recovery of personal chattels in specie upon a sworn affidavit and a bond from the plaintiff claiming ownership. Ala. R. Civ. P. 64 provides for the procedure to be followed for prejudgment seizure of property. This procedural rule requires that the plaintiff include in the affidavit "a description of the claimed property that is sufficient to identify the property and its location, an explanation of his entitlement to the property, an explanation as to why the property is wrongfully detained by the defendant and a statement of the risk of injury to the plaintiff. Ala. R. Civ. P. 64(b)(1). In addition the rule provides that the plaintiff has the "burden of showing good cause for the pre-judgment seizure". Ala. R. Civ. P. 64(b)(2)(C). "Implicit in 'good cause for prejudgment seizure' would be some showing of risk of injury or loss of the collateral without a prejudgment seizure." Green Tree Financial Corp. v. Garret, 185, B.R. 620, 624 (N.D.Ala. 1995).

The first item that plaintiff request to be seized is a Moyno pump which was taken from plaintiff's inventory over the weekend before the defendants resigned. This pump has a complicated purchase history. Engerson ordered the Moyno pump from the John H. Carter

company while he was still an employee of J. H. Wright, although he claims that the pump was for EGM and not J.H. Wright. Carter invoiced J. H. Wright for the pump and delivered the pump to J.H. Wright's facility. However, at some point Engerson arranged to have the invoice changed to EGM and upon leaving J. H. Wright took the pump with him. Plaintiff claims ownership of the pump based on the fact that it was invoiced and delivered to J.H. Wright and was ordered while Engerson was an employee of J. H. Wright. However, it appears from the invoice that Carter has credited J. H. Wright. While the ramifications of Engerson's actions are in dispute, the plaintiff has failed to sufficiently establish his entitlement to the pump. Moreover, the plaintiff has not established good cause for the prejudgment seizure.

Next, the plaintiff contends that the defendants are in possession of two Roper pumps and four stainless steel mixing blocks. The plaintiff indicates that these items were present prior to the departure of the defendants but are now missing. The defendants deny that they removed these items or are in possession of these items. The defendants believe that the Roper pumps were used on previous orders and were simply not charged properly against inventory. The defendants offered a reasonable account of where they believe the pumps are now located. The plaintiff did not contest this account. Therefore, the court determines that the plaintiff has failed to present adequate evidence that the defendants are even in possession of the blocks or pumps, much less that good cause exists to seize these items prejudgment.

The next item which the plaintiff requests to be seized is a polymer dilution unit. The undisputed facts are that the defendants built this unit at the J. H. Wright facility, removed it to their new business and have now sold it to another company. The defendants claim that the unit was built after hours using materials owned by EGM. The Plaintiff claims the unit was built at

J.H. Wright while the defendants were in the employ of J.H. Wright and therefore they are entitled to the unit. The plaintiff's argument is moot for purposes of seizure in that the evidence establishes that the unit has been sold and that the defendants are not in possession of it. The plaintiff has also failed to establish good cause to seize this item before this matter is ultimately resolved by a fact-finder.

Plaintiff also request the seizure of a test header which was admittedly taken by the defendants from the plaintiff's facility. The defendants, however, claim that they built this test header with materials owned by EGM and that this header belongs to them. Again, the plaintiff has failed to establish good cause to seize this item prior to a fact finder determining who owns the item in that no risk of injury or loss of the collateral has been shown.

The two Gould pumps which the plaintiff has requested to be seized have been returned. Therefore, this issue is moot.

The six boxes taken from the plaintiff's facility appear to be files or copies of files, computer disks and other materials relating to the defendants work at J.H. Wright. The defendants contend they each have a one-third ownership in these items due to the promise made by Mark Wright. This contention will be addressed in the underlying action. However, for purposes of establishing a claim to the boxes prejudgment, the court finds that the plaintiff has established good cause for the seizure since the documents taken appear to relate to the plaintiff's ability to continue to conduct his ongoing business. The plaintiff states that the boxes have a value of ten thousand dollars. No evidence was offered to contradict this. Therefore, the bond required for a writ of seizure shall be ten thousand dollars. The Defendants are ORDERED, if this recommendation is adopted by the District Court, within five days to either deliver the boxes

to the Clerk of Court or provide a bond as delineated in §6-6-250, Code of Alabama (1975). If the boxes are returned to the Clerk of Court, the plaintiff shall post bond as required by §6-6-250, Code of Alabama (1975). If the plaintiff fails to post bond as required the boxes will be returned to the defendant.

The plaintiff also request this court to issue a writ of seizure for all other documents and tangible items marked or identified by the names Precise Systems or J.H. Wright and Associates. The undersigned finds that this description is inadequate and the claim is too vague to allow for seizure. More importantly, the plaintiff has failed to show good cause to allow the prejudgment seizure.

**III. PRELIMINARY INJUNCTION**

The plaintiff has requested that this court enjoin the Defendants from filling any unlawfully diverted purchase orders or from performing work related to quotes that were made by either Engerson or Grant while they were employed by J.H. Wright. The Plaintiff claims that performing the work of these purchase orders or quotes would necessarily require the Defendants to use or disclose trade secrets in violation of the Alabama Trade Secrets Act and that this would result in irreparable harm to their business. Specifically, the Plaintiff claims that the following items taken by Defendants constitute trade secrets: 1)Manufacturing drawings and the bill of materials; 2)Plaintiff's financial information; and 3)Plaintiff's job files and quote files which includes the Plaintiff's pricing scheme.[4]

---

[4]These items, if in fact taken by the defendants, are to be included in the six boxes for which the undersigned recommends that a writ of seizure be granted.

A party seeking a preliminary injunction must establish the following four factors: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable injury, (3) that its own injury would outweigh the injury to the nonmovant, and (4) that the injunction would not disserve the public interest. Tefel v. Reno, 180 F.3d 1286, 1295 (11th Cir.1999); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir.1998). The Court should be mindful that a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant has clearly satisfied the burden of persuasion as to the four requisites. *Id.*; Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir.1990). The first two factors of the preliminary injunction standard are determinative in this case.

**A) Substantial Likelihood of Success on the Merits**

Plaintiff asserts a state law claim based on the Alabama Trade Secrets Act as his basis for the preliminary injunction. Under Alabama Code §8-27-3 (1993), a person who discloses or uses the trade secret of another, without privilege to do so, is liable for misappropriation of the trade secret if:

(1) That person discovered the trade secret by improper means;
(2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;
(3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2) above; or
(4) That person learned the information and knew or should have known that it was a trade secret and that its disclosure was made to that person by mistake.

In order for the information to be protected under the Alabama Trade Secrets Act, it must meet the definition of a "trade secret." Under Alabama law, a "trade secret" is information that:

a. Is used or intended for use in a business;
b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique or process;
c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
d. Cannot be readily ascertained or derived from publicly available information;
e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and
f. Has significant economic value.

Ala.Code §8-27-2(1) (1993). "The burden is on the one asserting the trade secret ... to show that it is included or embodied in the categories listed in §8-27-2(1)." Public Systems, Inc. v. Towry, 587 So.2d 969, 971 (Ala. 1991).

In Alagold Corporation v. Freeman, 20 F.Supp.2d 1305, 1316 (M.D. Ala. 1998), the court discussed what is required to establish a trade secret under Alabama law. In Alagold the plaintiff asserted a misappropriation of trade secrets claim under the ATSA against a former officer of the company, Michael R. Freeman, who went to work for one of its competitors. Alagold contended that Freeman's disclosure and use of proprietary information, which he had access to as Executive Vice President of Alagold and General Manager of its Riverdale Division, for the benefit of one of its competitors, would constitute a misappropriation of trade secrets. *Id.* at 1314.

Alagold claimed that its trade secret information included: "the design of its manufacturing line; manufacturing processes; computer software; building of a sales and distribution force; developing business strategies; developing relationships with and knowledge of its customers and potential customers and their needs, including . . . pricing and advertising; marketing of their products, design and artwork relating to their products; developing relationships with and knowledge of suppliers and their pricing structures; customer lists; vendor

lists; designers and artists." *Id.* at 1314, fn. 6.

In support of its claim that reasonable efforts were made to ensure the secrecy of the information, Alagold noted that the information was not freely accessible to all of its employees, the information was maintained in file cabinets where only limited employees were permitted access and that these offices were locked after regular business hours. *Id.* at 1315.

The court determined that employees at Alagold who needed to know the alleged trade secret information to carry out their jobs had free access to it, and none of the filing cabinets containing this information were locked. The court further found that Alagold presented no evidence that any of its proprietary information was marked "confidential", or that Alagold communicated to its employees that such proprietary information was to be kept confidential. *Id.*

More importantly, the court found that Alagold had given Freeman full access to all of Alagold's alleged confidential, trade secret information, and did not require him to execute a confidentiality or non-compete agreement limiting the use of information that Freeman may have learned during his employment with Alagold. Given these facts, the court held that "it cannot be said that Alagold undertook reasonable efforts under the circumstances to maintain the secrecy of its information." *Id.* at 1316. Accordingly, the court held that Alagold did not satisfy its burden of establishing that such information satisfied the requirements of a "trade secret" entitled to protection under the ATSA and granted summary judgment on the issue. *Id.*

As in Alagold, the undersigned finds that the plaintiff has failed to establish that the information he now seeks to protect as trade secrets was subject to reasonable efforts to protect its secrecy while the defendants were employed at J.H. Wright. Therefore, because the plaintiff

has failed to establish an essential element of its claim, it is not likely that they will succeed on the merits and hence injunctive relief is not warranted.

1) Manufacturer Drawings and Bill of Materials

Plaintiff hired a part-time contract employee to prepare drawings on an AutoCad computer program of the chemical feed systems that it designed and manufactured. These drawings were usually made after the system had been manufactured. The Plaintiff contends that two types of drawings were produced; a customer drawing which was disclosed outside the company and a manufacturing drawing which was not. The manufacturing drawings are more detailed and contain precise dimensions, bill of materials and vendor information[5]. The manufacturer drawings are the purported trade secret which the plaintiff seeks to enjoin the Defendants from using in their new business.[6]

While the manufacturer drawings are used in business and have a significant economic value, the plaintiff has failed to show that they are likely to succeed on the other required elements necessary to qualify the drawings as a protected trade secret. Specifically, the Plaintiff

---

[5]Plaintiff also made a vague claim that the vendor information was a trade secret. However in *J.E. Hanger, Inc. v. Scussel*, 937 F. Supp. 1546, 1558 (N.D. Ala. 1996), the court determined that the vendor materials were readily ascertainable and did not qualify as trade secrets because anyone could call the manufacturer and ask for the vendor information, and it would be voluntarily sent to them. The evidence established that the same is true in this case. The Plaintiff has failed to establish that the vendor information is a trade secret since such information is publicly available.

[6]The Defendants indicate that they have no use for the manufacturer drawings since each product is custom made to meet the specialized needs of the customer and therefore the measurements and materials used will invariably differ with each product.

must show that the information is not generally known in the trade or business of the person asserting that it is a trade secret and that it cannot be readily ascertained from publicly available information. The manufacturer drawings are made on an AutoCad computer program which is publicly available for purchase. The drawings are made by ascertaining the dimensions of the system and each sub-part and then inputting this information into the computer program. Engerson testified, and it was not contradicted, that the system is subject to visual inspection and duplication by any competitor in the industry who has access to the system once it is sold. Since the drawings constitute only the measurements and the materials used to build the system the drawings are also subject to duplication.[7] The evidence establishes that the plaintiff on occasion gave manufacturing drawings to their customers when necessary.[8] Moreover, the evidence showed that the materials used to manufacture the product are routinely disclosed to potential customers as a means to bolster the quality claims and to account for the quoted price. Therefore, the plaintiff is not likely to establish that the drawings and bill of materials are not generally known or readily ascertainable whereas to qualify them as a trade secret under Alabama law.

Moreover, J.H. Wright must establish that they took reasonable measures to protect the secrecy of the drawings. Mark Wright testified that J.H. Wright had undertaken reasonable

---

[7]Engerson, the engineer who was primarily responsible for manufacturing the systems, stated that he rarely used a drawing to manufacture a system, nor did he ever use a previous drawing to manufacture a new system because each system was custom made to meet the specific needs of the customer.

[8]Engerson testified that the customer would need the drawings for repair work and therefore it was logical to assume that the drawings were part of what the customer purchased.

measures to protect the secrecy of the drawings and the materials used to manufacture the systems. Mark Wright also testified that J.H. Wright had a written policy manual generally requiring confidentiality, that J.H. Wright locked its premises at night, had a security system that restricted access to its buildings and put the AutoCad program on a non-networked computer. However, in contradiction to the claim that reasonable efforts were taken to preserve the secrecy of the information, the evidence shows that the drawings were made by a part-time contract employee, Dimitrios Mathews, who was free to work for Precise Systems' competitors. Mathew never signed a non-compete or confidentiality agreement with J.H. Wright. The other employees who routinely had access to the drawings were also not informed that the material was confidential, nor were they required to execute a confidentiality or non-compete agreement. The drawings or bill of materials were not marked confidential, and as stated above, J.H. Wright was willing to share this information with their customers whenever necessary. It should also be noted that J.H.Wright's policy statement concerning proprietary information did not list manufacturer drawings or bill of materials as covered documents. Therefore, the plaintiff has not established that he is likely to succeed on the merits of his claim that the bill of materials and the drawings were subject to reasonable efforts to maintain their secrecy in order to qualify as trade secrets under Alabama law.

2). Financial Information

The plaintiff claims that the defendants have financial information that constitute trade secrets and that reasonable efforts were taken to protect the confidentiality of the information. Specifically, the plaintiff claims that the financial information regarding J.H. Wright's profits/losses was given to the defendants for the limited purpose of considering the offer to

become a 20% owner in the business and that it was confidential for all other purposes. The plaintiff further contends that the defendants have wrongfully used this confidential information in an effort to gain credit for their new business.

The defendants first contend that the financial information given to them by J.H. Wright has not been used in their new business.[9] The defendants next argue that even so, the financial information does not constitute a trade secret. The defendants point to the fact that they were provided the financial information and urged to share it with their banker, accountant and any other family member deemed appropriate to assist in the decision whether to take the offer to become a 20% owner. Grant testified that the defendants were also regularly given financial information, while employed at J.H. Wright, about Precise Systems and that he would often find this information sitting in his chair. The defendants also note that none of the financial information was marked confidential nor was there any communication to them that it was to be returned or kept confidential. While the court notes that the plaintiff's written confidentiality policy covers financial information, this alone in insufficient to establish the financial information as a trade secret under Alabama law. While the information might be confidential and subject to other disclosure prohibitions, plaintiff has failed to establish that it took reasonable steps to protect it as a trade secret. *See* Alagold, *supra,* at 1314, n.8 (Financial statement not a trade secret because it was not marked confidential nor was employee instructed to keep the statement confidential).

---

[9]Michael Holland, a loan officer at Regions Bank, testified that he did not consider J.H. Wright's financial information when considering whether to give a business loan to the defendants. He further stated that the J.H. Wright information was given to him in relation to the discussions about the ownership offer that had been extended to the defendants by J.H. Wright.

3. Job and Quote Files

Plaintiff also contends that the job files which contain quotes are trade secrets. A job file is created once a quote has been accepted by a customer. Included in the job file is the quote work-up sheet which details the materials to be used on the system, the plaintiff's cost to acquire these items, information concerning plaintiff's profit margin and any sketches or preliminary drawings of the system to be built for the customer.

The plaintiff contends that the defendants have misappropriated some of the job files and request that this court restrain the defendants from performing work related to any job where quotes had been issued by the defendants while they were at J.H. Wright.[10] The contention by the Plaintiff and the requested relief are incongruous. The requested injunctive relief, if granted, could only extend to enjoining the defendants from using or disclosing trade secrets while filling these job orders. The plaintiff has not requested injunctive relief on any other basis. However, in any event, the plaintiff has not met his burden to show that he is likely to succeed on the claim that the job files constitute protected trade secrets. The evidence showed that these files were accessible and in fact were routinely accessed by many employees of J.H. Wright, including the bookeepers, invoicing employees, filing clerks, sales people, office manager and all Precise System employees. These files were not kept in locked cabinets nor were they in anyway marked confidential. After the job was completed the job files, with these alleged trade secrets, were moved to J.H. Wright's central office and stored in unlocked files where no special passcode was required for entrance. While the cost of manufacturing a product was not

[10]The defendants deny taking any job files and the evidence showed that only three were claimed to be missing.

routinely disclosed to the customer and product cost information was listed as proprietary information in the policy manual, the evidence does not establish that it was protected as a trade secret. Therefore, plaintiff has failed to show that he is likely to succeed on the merits of this claim.

**B) Irreparable Harm**

More importantly, plaintiff has failed to show that irreparable harm will result. "An injury is 'irreparable' only if it cannot be undone through monetary damages." Cate v. Oldham, 707 F.2d 1176, 1189 (11th Cir.1983). The plaintiff alleges that Precise Systems' reputation will be damaged if injunctive relief is not granted. However, the only evidence offered by the Plaintiff was that customers had become confused as to what services were still being offered by J.H. Wright and that some customers had canceled orders with Precise Systems. Injury as a result of competition, even when that competition is due to allegedly misappropriated trade secrets, can be compensated fully by looking to the defendants' profits. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir.1998). Therefore, Plaintiff is unable to establish irreparable injury as required for injunctive relief.

**V. CONCLUSION**

Upon consideration of the briefings, the evidence presented at the hearing and the pertinent law, it is recommended that the plaintiff's motion for a temporary restraining (Doc. 2) and preliminary injunction (Doc. 6) be **DENIED** and that the plaintiff's motion for writ of seizure (Docs. 4, 19, 25) be **DENIED in part and GRANTED in part** as more fully explained

above. Plaintiff's Motion for leave to take immediate discovery (Doc. 7) is determined to be **MOOT.**

The attached sheet contains important information about this report and recommendation. Please note that any objection must be filed within 5 days.

Done this 2nd day of November, 2000.

KRISTI D. LEE
UNITED STATES MAGISTRATE JUDGE

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1. **Objection**. Any party who objects to this recommendation or anything in it must, **within 5 days of the date of service of this document,** file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 2nd day of November, 2000.

KRISTI D. LEE
UNITED STATES MAGISTRATE JUDGE